COOPER *v.* CALICO.

4-8737                                          218 S. W. 2d 723

Opinion delivered March 7, 1949.

Rehearing denied April 4, 1949.

*Daily & Woods,* for appellant.

*G. T. Sullins* and *Rex W. Perkins,* for appellee.

GRIFFIN SMITH, Chief Justice. The Chevrolet automobile driven by appellant Doyle Cooper at Fayetteville the night of October 18-19, 1947, was struck by a Ford operated by Charles Oliver. With Cooper as his guests were Joseph B. Westbrook, 29 years of age; Odell

Pollard, 21; Ruby Prather, 18, and Wanda Lee Calico. In an action for personal injuries charging Cooper with willful misconduct and wantonly driving in a manner disregarding the rights of others, Wanda Lee procured judgment for $4,000. Cooper's appeal challenges sufficiency of the evidence, insistence being that a case was not made for the jury.[1]

About eight o'clock the evening of October 18, Cooper drove to the American Legion Hut in Fayetteville. Finding that it was not open, he went to a "package house" about a block away where he procured and drank a can of beer. After that he "more or less walked the streets" until nine o'clock, when the Hut opened. There he met Westbrook, and the two drove to "Jug" Wheeler's Drive-In and had a drink, then returned to the Hut and remained until it closed at midnight.

During the time spent at the Hut, Cooper was introduced to Pollard, with whom Wanda was dancing. Westbrook was dancing with Ruby Prather. Cooper was under the impression that he did not dance, and that after leaving Wheeler's place he had not touched intoxicants. Appellant admitted having "a fifth" when he and Westbrook went to Wheeler's. The bottle, according to Cooper's testimony, contained about three ounces, and the purpose in going to Wheeler's was to get a "chaser".[2]

The party of five left in Cooper's car at twelve o'clock and went directly to Rainbow Drive-In, two miles north on Highway 71, but within the City limits. It is a place of night entertainment liberally patronized by young people, with facilities for "curb service." The building is set back considerably from the highway, per-

---

[1] Cooper and Westbrook were G. I. students at the University and had known each other for several years. Cooper was majoring in social welfare. Pollard, also a University student, was in the school of law. Wanda was in high school.

[2] The testimony is not clear regarding content of the bottle taken to Wheeler's. While denying that anything was imbibed after leaving Wheeler's, appellant said: "I took the drink at Jug's out of my own bottle." Q. "What size?" A. "A fifth." Q. "And you brought that fifth to that dance hall?" A. "I did." Prior to making these statements appellant had testified that he and Westbrook drank about three ounces—all that was in the bottle. Specifically, he said: "It's hard to say how much each of us drank, but it was a very small amount. It was about half a coke bottle full, which is six ounces."

mitting cars to park on a graveled space of approximately 155 feet along the highway.

Cooper entered the parking area on the north side, but found it crowded and concluded to move to the south end where a vacancy was observed. His version of the transaction is that in attempting to shift gears the car rolled back. In doing so it left the gravel and the rear protruded over the paving. At the moment this occurred the car driven by Oliver—traveling, as the operator admitted, 50 miles an hour—smashed into the Chevrolet. Wanda Lee, who was in the rear seat, sustained serious injuries, including a fracture of the skull at its base. She did not know how the impact occurred and could not testify to anything of importance regarding preliminary or concurring movements.

Appellant persistently denied that warning was given by any of his companions, but was sure he looked back before allowing the car to coast. His intention was to stop before reaching, or *at,* the concrete curb. Cooper conceded he did not look up or down the highway before attempting the move, explaining that he had no intention of entering the zone of danger and for that reason was not apprehensive of traffic.

Westbrook, in testifying, was not positive whether Cooper had the car in gear, or coasted back. After entering the parkway on its north side, neither Cooper nor any of those with him mentioned changing the car's position. The act was apparently voluntary on Cooper's part, and the attempt to move was without comment. Nothing in Cooper's appearance or demeanor suggested to Westbrook that as a driver he was not in normal control of the car. Specifically, there was nothing to indicate that the early evening drinking had, at the time taken or thereafter, affected Cooper.

Pollard saw the approaching Ford when it was 100 to 150 yards away, and testified he said, ''you had better watch: there are awful crazy drivers around here.'' When Oliver's car was within 50 yards of the position marked by the Cooper car, Pollard realized there would

be a collision, and tried to shield Wanda Lee, but did not have time to be effective. The highway was perfectly straight, without obstructions. Pollard thought the Cooper car, after backing or coasting onto the highway, remained momentarily immobile. During this interval the witness said to Cooper, "We'd better hurry up and get off," or something to that effect.

Ruby Prather only remembered that Cooper backed onto the highway and the collision occurred "almost instantly." She was rendered unconscious. Like Pollard, Ruby had seen the Oliver car when it was 150 yards away and supposed it would pass around them. She thought Cooper's motor was running, but did not know whether he was shifting gears. "There was no noise of spinning wheels or a racing motor."

Effect of the testimony given by Bonnie Dotson, who was with Oliver, is that as the Ford approached Rainbow a car suddenly "shot out" from the driveway. Oliver's version of the transaction was that the Chevrolet backed out so quickly that no precautions on his part could have avoided the collision.

Richard H. McChristian, patrolman on the Fayetteville police force, called about 12:16 October 19th, was told of the mishap. When he arrived at Rainbow "ten bodies were scattered over the highway." Cooper's Chevrolet was demolished. Skid marks made by rear wheels of the Cooper car measured a little more than ten feet, while signs left by the Ford were observable for 66 feet. Cooper was asked how the wreck occurred, and replied that he was trying to make a right turn into the Rainbow area. Tracks made by disturbed gravel led to the edge of the highway, and on the highway marks made by burnt rubber extended a distance of 18 inches, in line with the displaced gravel, indicating, as the witness thought, the Chevrolet's course of travel. McChristian asked Cooper if he had been drinking, and the latter replied that he took one drink at the Legion Hut.

Ted Grigsby, another patrolman, verified the burnt rubber signs, and measurements mentioned by McChris-

tian. His conclusions, like McChristian's, were that the black marks and gravel displacements were from the Chevrolet. Cooper told this witness that he took a drink of whiskey while at the Hut. The speed limit on the highway adjoining Rainbow is 25 miles per hour. The only indication of law violation noticed by McChristian was Oliver's high rate of speed, and he was given a summons.

Patrolman L. S. Kyle testified that "There were about eighteen inches of skid marks on the pavement where the Chevrolet had backed out spinning its wheels in the gravel, and it hit the pavement and continued spinning, and its tires burned rubber."

Acts 61 and 179 of 1935, Pope's Digest, §§ 1302-4 deny recovery to a person riding with the owner or operator of an automobile as a guest unless (Act 61) such vehicle ". . . was wilfully and wantonly operated in disregard of the rights of the other," or (Act) 179 ". . . such injury shall have been caused by the wilful misconduct of such owner or operator."

Power of the General Assembly to prescribe limitations fixed by the statutes was upheld in *Roberson* v. *Roberson,* 193 Ark. 669, 101 S. W. 2d 961. An early construction denied recovery to a young man where the injury occurred on ". . . just such a trip as is taken on innumerable occasions by innumerable boys and girls, and [our guest statutes deny recovery] to any member of such a party except for injuries resulting from the wilful [and] wanton operation of the vehicle." *Ward* v. *George,* 195 Ark. 216, 112 S. W. 2d 30.

Other decisions dealing with one or both of the Acts are *Froman* v. *J. R. Kelley Stave & Heading Co.,* 196 Ark. 808, 120 S. W. 2d 164; *Splawn, Adm'x,* v. *Wright,* 198 Ark. 197, 128 S. W. 2d 248; *Edwards* v. *Jeffers,* 204 Ark. 400, 162 S. W. 2d 472, and *McAllister, Adm'r,* v. *Calhoun,* 212 Ark. 17, 205 S. W. 2d 40. In these cases terms used by the lawmakers in declaring the public policy were discussed and construed. We have approved the language of other courts where it was said that wilful negligence is greater in degree than gross negligence;

that to be wilfully negligent one must be conscious of his conduct—that is, he must, in the light of surrounding circumstances, comprehend that his act will naturally or probably result in injury. Differently expressed, wilful negligence "involves the element of conduct equivalent to a so-called constructive intent." Compare *Hodges* v. *Smith*, 175 Ark. 101, 298 S. W. 1023, a case involving punitive damages.

Appellee quotes part of the Court's summary of facts in the Froman-Kelley Co. case, *supra*, our holding having been that the testimony was sufficient to go to the jury.[3] It is urged that facts in the Froman case are, for all practical purposes, similar—or at least analogous—to what a preponderance of testimony in the case at bar points to. But conceding this to be true if the opinion had stopped where appellee quit quoting, yet in order to draw correct comparisons we must consider the entire paragraph from which the excerpt is taken, including the following:

". . . The car stopped at Brinkley, where Futrell and Hudkins drank beer and bought a bottle of wine [of undisclosed size]. The wine was consumed by Futrell and Hudkins and Mrs. Stronger's grandson. . . . The grandson testified that the wine . . . made him drunk, and Mr. and Mrs. Stronger testified 'That both Futrell and Hudkins were visibly under the influence of the intoxicants, and that after becoming so they accelerated the speed of the car over the protest of the ladies.' "

Of course substantial evidence of intoxication in a case like the one at bar should go to the jury, for the fact-finders might reasonably say that an operator so situated intentionally satisfied his appetite at the expense of physical coördination, hence there was constructive intent to do the things that would naturally flow

---

[3] The part copied by appellee is: "The car was driving so fast and recklessly that they almost ran into a truck, and then almost ran into a ditch, and when the ladies renewed their protests Hudson inquired of Futrell if he was about to 'park' his car. The car continued at a high speed as it approached a curve in the road, and the driver 'undertook to make the curve going 50 or 60 miles an hour,' and was driving on the wrong side of the highway."

from intoxication. That, however, is not the case here. No witness testified that Cooper was under the influence of intoxicants. The officers saw nothing to arouse their suspicions.

Counsel for appellee urge that when Cooper first told McChristian and Grigsby that the accident happened, [while he was "trying to make a right turn into the parking area"] he was either abnormal, or was intentionally evasive; hence, inferentially, the jury might infer intoxication. Again, denial by Cooper that he told the patrolmen a drink was taken at the Hut, and affirmance by the officers that he did make the statement,— the conflict is argued as a factual basis for the postulate that (a) if Cooper admitted drinking beer at eight o'clock, and (b) shared six ounces of liquor with Westbrook shortly before nine, then (c) took one more drink while at the Hut, the presumption of partial intoxication shortly after midnight becomes a legal conclusion, attaching in spite of assertions by all of the witnesses who testified that nothing of the sort was disclosed. Pyramidal presumptions are lacking in that probative substance found in reasonable inferences, or arising from probabilities common to human experiences.

Final argument in support of the verdict is that marks left by rear wheel tires show that the Chevrolet was driven so rapidly in reverse that friction from concrete and gravel left a tell-tale imprint of reckless haste.

While all of the witnesses having knowledge of Cooper's movements testified contrary to the theory of a sudden burst of speed, and while each could have been wrong as opposed to this physical evidence of applied power in traveling down grade, (a determination the jury could have made) there remains the proposition that a young man skilled in the use of an automobile, who was not shown to have been under the influence of intoxicants, whose actions at the wheel had caused no one concern, who undertook to do a perfectly normal thing in moving from a crowded parking area to one less congested,—we find this driver (accepting appellee's tes-

timony) suddenly on the paved highway, in the path of an oncoming car. No one could successfully deny that his conduct was careless. Certainly he was negligent in not stopping and looking in each direction before placing his Chevrolet and his passengers in a position of peril. But even gross negligence, under the Guest Statutes, is not enough. There must be a wilfulness, a wantonness, an indifferent abandonment in respect of consequences, applicable alike to self and guests.

It is our view that the evidence did not meet this test, and that a verdict for the defendant ought to have been instructed.

Reversed, with directions to dismiss the complaint.

ED. F. McFADDIN, Justice (dissenting). Act No. 179 of 1935 says a guest cannot recover from the owner or operator of a motor vehicle for injuries sustained unless the injury was caused "by the willful *misconduct* of such owner or operator." Act No. 61 of 1935 says a guest cannot recover from the owner or operator of a motor vehicle for injuries unless such vehicle "was willfully and wantonly *operated* in disregard of the rights of the others." Act No. 179 does not say that the operator must be guilty of willful *negligence*: it says willful *misconduct*. Act No. 61 does not say that the operator must be guilty of willful and wanton *"negligence"*: it says his driving must have been "willfully and wantonly in *disregard* of the rights of the others." The point I make is that neither act says "negligence"; each refers to the conduct of the driver.

I think a case was made for the jury when it was shown: (1) that the defendant had been drinking shortly before the collision; and (2) that the defendant—after being warned "you had better look out, there are awfully crazy drivers around here"—backed his car with great force onto the concrete slab in the direct pathway of the rapidly approaching car. The concurrence of these factual showings made a case for the jury.

I desire to elaborate on the matter of driving after drinking. Remember the acts say willful and wanton

"misconduct"—not *"negligence."* Now the dictionary defines *misconduct* to be "wrong or improper conduct." I submit that it is wrong or improper conduct for anyone to drive a motor vehicle shortly after drinking intoxicants.

The effect of the majority opinion is to declare—as a matter of law—that driving shortly after drinking is not improper conduct. The majority is going a long way towards putting the stamp of judicial approval on driving after drinking. I submit that this Court should allow the jury the right to determine, in each case, whether such driving after drinking is misconduct under the facts there presented. Yet, in the case at bar, the majority is refusing the jury the right to so decide.

MILLWEE, J., joins in this dissent.